**Fitzgerald L. PARKER, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 98–CF–755, 98–CO–1460.**

District of Columbia Court of Appeals.

Argued Jan. 6, 2000.

Decided Feb. 10, 2000.

**934**

Kenneth H. Rosenau, Washington, DC, for appellant.

Toni B. Florence, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth H. Danello, and D. Ames Jeffress, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, REID, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

This appeal from convictions for distributing cocaine in a drug-free zone and enlisting a minor to distribute drugs presents chiefly a speedy trial issue resulting from the prosecutor's apparent failure to confirm a laboratory drug analysis until the day of the second scheduled trial a year after appellant's arrest, with the consequence that appellant nearly—but not, we conclude, in fact—lost the availability of two witnesses whom the trial court recognized to be important to his defense. After balancing the factors relevant to the claimed denial of the constitutional right, we conclude that appellant was not denied his right to a speedy trial. As we also

1. He had been sentenced for a drug conviction in July of 1992 and, following an initial violation of probation, re-sentenced in 1994 to

reject his remaining contentions, we affirm the convictions.

**I.**

A jury found that on July 10, 1996, appellant twice sold cocaine to an undercover police officer in a drug-free zone (*i.e.*, within one thousand feet of a school), D.C.Code §§ 33–541(a)(1), –547.1 (1998), in each case having enlisted a minor to aid him in the distribution, *id.* § 33–547(a). We reserve the facts relating to the sales until part III, *infra*, and describe first the circumstances relevant to appellant's speedy trial claim.

Appellant was arrested on July 10, 1996, charged that day with distributing cocaine, and held pending possible revocation of his probation on a prior conviction.[1] He was indicted on August 13 and arraigned two weeks later, at which time an October 8, 1996, status date was set. Following a change of counsel for appellant, another status hearing was held on December 5 at which time the first trial date was set for April 25, 1997. Meanwhile, the court had revoked appellant's probation, see note 1, *supra*, based on his repeated failure to meet with the probation officer in that case.

On April 25, 1997, the prosecutor was unavailable because of a family emergency, and trial was re-scheduled for August 12. On that day the trial court called for a jury panel, but before *voir dire* was completed the prosecutor moved to dismiss the case without explanation (and without prejudice to reindictment). The government later explained that the DEA laboratory had failed to analyze the drugs bought by the officer in this case. The court granted the government's motion.

A new indictment was returned on September 10, 1997, appellant was arraigned on September 24, and a status date was set for October 10, 1997. On that date

two to six years of imprisonment which were again suspended in favor of probation.

appellant's counsel told the court that he could no longer locate two defense witnesses who had been available for trial on August 12; he asked for, and received, a continuance in order to file a motion to dismiss on speedy trial grounds. At a hearing on November 13, counsel described his unsuccessful efforts to find the two witnesses, prompting the trial court to express "concern[ ] about whether the Government [had] behaved ... fair[ly] to the defendant" by dismissing at the last minute, with the result that "witnesses who were available then are not available now." The court set a renewed trial date for December 3, which was converted to a status date after appellant moved in writing to dismiss on speedy trial grounds. The court (Judge Bartnoff) heard argument on the motion on December 18, at which appellant proffered to the court *ex parte* what testimony the two witnesses (an alleged juvenile accomplice and an adult eyewitness) had been expected to give. The court found that these were indeed "important witnesses for the defense and have important information to provide"; it likewise did not question appellant's diligence in trying to find them again. It nevertheless denied the motion to dismiss after concluding that the government's dismissal of the case (followed by prompt re-indictment) had not been done "to gain any kind of tactical advantage" and that "at this point"—some seventeen months after arrest—appellant's speedy trial rights had not yet been violated. Authorizing "additional investigative vouchers to enable [the defense] to continue their attempt to find these witnesses," the court set a new trial date of March 12, 1998.

Those efforts appeared successful, at least initially, because on the eve of the defense case at trial appellant's counsel told the court (now Judge Winfield) that he would be calling two witnesses to the stand, as well as (possibly) appellant. Discussion the next morning revealed that these were the same witnesses the defense had previously been unable to re-locate.

Counsel now found himself embarrassed, however, because although his investigator had been expected to pick up the witnesses and bring them to court that morning, neither the investigator nor the witnesses had arrived. Counsel assured the court that both witnesses "[had] been prompt" in coming to court "since the trial has started." A moment later the investigator himself arrived, but the witnesses were not with him. As to the adult witness, counsel stated that "he [the witness] knew he was going to testify," and counsel had given the investigator the address where he usually stayed, but apparently the witness had not been at the address that morning. The juvenile witness was also expected but had not appeared yet. Pointing out that both witnesses were under subpoena, defense counsel stated that "[i]f the court [is] willing to enforce the subpoena we would have reasonable expectation of finding" the witnesses. After hearing proffers of what each witness would say and concluding that "they clearly are important witnesses to the defense," the court agreed to enforce the subpoenas if appellant was willing to accept the additional delay, stating: "I would be willing to delay the trial [for several hours and] send the Marshals out to find [the witnesses]." After talking with appellant privately, however, defense counsel responded simply: "The client wishes to go forward at this time." The trial therefore proceeded to conclusion.

## II.

Appellant contends that the twenty-one month delay between his arrest and trial denied him a speedy trial because it deprived him of the availability of witnesses the trial court had twice recognized to be important to his case. In making this argument, he emphasizes the government's neglect in declaring ready for trial on August 12, 1997, when his witnesses were available, only to move for dismissal after realizing that it did not have the necessary drug analysis. While the prosecutor's lack of preparation is disturbing, we conclude

that appellant has not demonstrated delay or resulting prejudice sufficient to justify the "drastic remedy of dismissal" which a constitutional speedy trial violation demands. *United States v. Bolden*, 381 A.2d 624, 625 (D.C.1977).

In evaluating a speedy trial claim, this court conducts the four-factor inquiry required by *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *see Graves v. United States*, 490 A.2d 1086, 1090–91 (D.C.1984) (en banc). The four factors are length of delay, reasons for delay, assertion of the right to a speedy trial, and prejudice caused to the defendant. *Barker*, 407 U.S. at 530, 92 S.Ct. 2182; *Graves*, 490 A.2d at 1091. "No one factor is either sufficient or essential[;] instead a 'difficult and sensitive balancing process' is required." *Turner v. United States*, 622 A.2d 667, 673 n. 8 (D.C. 1993) (quoting *Barker*, 407 U.S. at 533, 92 S.Ct. 2182).

The lapse of twenty-one months between appellant's arrest and trial is a "substantial delay," approaching twice the length of time that "creates a presumption of prejudice and shifts the burden to the government to justify the delay." *Graves*, 490 A.2d at 1091 (citations and footnote omitted). Moreover, the delay occurred in a case where—as the trial confirmed—proof of the offenses was likely to be "uncomplicated" rather than "complex." *Turner*, 622 A.2d at 675. We agree with appellant that the seven months between the aborted trial in August 1997 and the trial in March 1998 must all count "significantly" against the government. *See Graves*, 490 A.2d at 1092. The same can also be said of the four months between April and August 1997, because if the drug analysis had not been performed by August, it assuredly had not been done by the first trial date scheduled in April. Thus, although we reject appellant's argument that any of this delay was "deliberate foot-dragging [by the government] to gain tactical advantage," *id.*,[2] it nonetheless counts more heavily against the prosecution than what the court has termed "neutral" or "institutional" delay. *Id.* Further, the government does not dispute that appellant timely asserted his right to a speedy trial,[3] a consideration itself "entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32, 92 S.Ct. 2182.

In sum, the government's unreadiness for trial on two occasions in a fairly uncomplicated case spanning twenty-one months between arrest and trial gives us substantial pause, at least enough to require careful attention to appellant's claim of prejudice from the delay. *Barker* defined three forms of prejudice in terms of the separate interests the speedy trial right is designed to protect: "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Graves*, 490 A.2d at 1101. Appellant focuses almost exclusively on the third,[4] which the Supreme Court

---

2. The prosecutor's neglect in not checking the results of the laboratory analysis is not the equivalent of "bad-faith delay," *i.e.*, where "the Government [has] intentionally held back in its prosecution of [the defendant] to gain some impermissible advantage at trial." *Doggett v. United States*, 505 U.S. 647, 656, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

3. We accordingly do not dwell on that factor even though we emphasize, as we did in *Graves*, 490 A.2d at 1098, that there is a difference between moving for dismissal of the indictment—as appellant did—and ex-

pressing a desire to be tried speedily. *See also Graves*, 490 A.2d at 1101.

4. Although appellant was incarcerated almost from the time of arrest in this case, the judge who revoked his probation—who was also the trial judge in this case—made explicit that the revocation had nothing to do with his arrest in this case; it stemmed rather from his repeated failure to meet with the probation officer following his re-sentence to probation in 1994. Further, although the lengthy sentence exposure that hung over appellant's head as a result of the present charges is a consideration, the anxiety and concern this naturally

itself has said is the "most serious" form of prejudice, because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182; *see also Doggett, supra* note 2, 505 U.S. at 654, 112 S.Ct. 2686. Appellant argues that the unavailability of two important defense witnesses stemmed directly from the government's voluntary dismissal in August 1997. If that assertion were true, there would be real substance to his speedy trial claim. But, as the facts recited earlier demonstrate, it is appellant who bears ultimate responsibility for the fact that the witnesses did not testify at trial.

The record is clear that appellant regained contact with the witnesses after his motion to dismiss was denied, subpoenaed them, and awaited their arrival in court with his investigator on the morning the defense was set to begin its case. When they did not appear, the court offered to postpone the trial for several hours and send the Marshals to get them, but appellant, after consulting with his attorney, declined. Whatever the reason for that decision,[5] it reveals the absence of the witnesses to be, in the end, a misfortune of appellant's own making, and in our judgment it severs the causal link between their absence and the government's unreadiness for trial months earlier. Appellant responds by arguing that the unavailability of the witnesses should be assessed as of the time the court denied his motion to dismiss in December, when his diligence in searching for them had not yet borne fruit; the prosecution, he asserts, should not benefit from the happenstance that the court could not immediately proceed to trial after denying the motion. This argument, however, ignores the fact that "a central interest served by the Speedy Trial

Clause is the protection of the fact-finding process *at trial.*" *United States v. MacDonald*, 435 U.S. 850, 859–60, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978) (emphasis added). In *MacDonald*, the Supreme Court recognized that because "a speedy trial claim necessitates a careful assessment of the particular facts of the case ... most [such] claims ... are best considered only after the relevant facts have been developed at trial." *Id.* at 858, 98 S.Ct. 1547. Discounting the rediscovery of appellant's witnesses by the time of trial would amount to "vindicat[ing] a right that had not yet been shown to have been infringed." *Id.* at 861, 98 S.Ct. 1547.

■ After balancing the *Barker* factors, we conclude that appellant was not denied his right to a speedy trial. The delay of twenty-one months, even taxing the government significantly with eleven months of it, is not sizeable enough to warrant dismissal without evidence of prejudice not apparent on this record. *See Day v. United States*, 390 A.2d 957, 970 (D.C.1978) (showing of no prejudice by the government "is a powerful offset to the government's responsibility for excessive delay"). *See also Turner*, 622 A.2d at 680 (almost 24-month delay "was regrettable, particularly in view of the fact that more than a year passed after the first trial date before any effort was made to advance the trial," but no speedy trial violation was demonstrated in part because defendant had "not shown prejudice caused by the delay"); *Parks v. United States*, 451 A.2d 591 (D.C. 1982) (19-month delay; no violation where, *inter alia*, defendants were tried within four to seven months after asserting right, they were incarcerated on other matters as well, and there was no showing of impairment of their trial preparation); *Lemon v. United States*, 564 A.2d 1368, 1379

---

would have caused him was attenuated by the fact that he still had significant prison time to serve on his prior sentence, and by his "prior experience with the criminal justice system." *Graves*, 490 A.2d at 1104.

5. The trial court had suggested the jury might hold the additional delay against appellant, but, as his attorney presumably advised him, the court could take steps to minimize that concern. We observe also that at one point appellant's counsel expressed doubt whether the juvenile witness would be cooperative.

(D.C.1989) (22–month delay; no violation in part because no "persuasive showing of specific prejudice").

### III.

Appellant was convicted, among other things, of "enlist[ing]" a person under 18 years of age to distribute a controlled substance. D.C.Code § 33–547(a). He argues that the evidence was insufficient to support this conviction because it showed only that he and the juvenile were "[w]orking alongside one another," and "working together on the street [selling drugs] has nothing to do with who enlisted whom to start that cooperative venture." Brief at 22. Although the statute does not define "enlist," appellant effectively makes the same argument this court viewed skeptically in *Outlaw v. United States*, 604 A.2d 873 (D.C.1992), which is that evidence of aiding and abetting a minor cannot support a conviction for "enlist[ing]" under § 33–547(a). As we pointed out there, the verb "encourages," which the statute uses conjointly with "enlists," is "a classic alternative formulation of the purposeful activity necessary to establish aiding and abetting." *Id.* at 875.

In any case, here as in *Outlaw*, the evidence fairly allowed the jury to conclude that appellant engaged in "causative—in the sense of procuring—activity" vis-a-vis the minor, *id.* and so met any requirement of instrumentality that "enlist" may be thought to connote. The drug transactions began when appellant asked the undercover officer "what's up" and, receiving the answer "a 20," beckoned the juvenile accomplice and spoke with her.

She produced a plastic bag containing white rocks from which appellant removed one and gave it to the officer for a twenty dollar bill. After saying he "might want another one," the officer left but returned soon afterwards and asked for a "ten." Appellant directed the juvenile to "give him a ten," which caused her to say that she didn't know which ones in the bag were "tens" and give appellant two rocks. Appellant selected one and gave it to the officers for two five dollar bills. As the trial court aptly summed up:

> Well, guess what? Each time he snapped his finger she came over and opened the bag and he got drugs from her.[6] That sounds to me like control. It's got to be enlisting. It isn't that he hired her. Did he employ her? That is to say, use her? Yes; according to these facts that have been presented.

*See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1971) (defining "enlist" as: "to engage" or "to secure the support and aid of"); 21 U.S.C. § 861(a)(1) (making it a crime for anyone eighteen or over to "employ, hire, *use,* persuade, induce, entice, or coerce" any person under eighteen to commit drug offense) (emphasis added). The evidence amply supported an inference that appellant used the minor's services in the way proscribed.[7]

Affirmed.

---

**6.** As we stated in *Outlaw*, "it was not irrational to infer that the stash was kept by [the juvenile] precisely because of [her] lesser vulnerability as a juvenile to criminal punishment." 604 A.2d at 876.

**7.** To the extent appellant faults the court for not defining "enlist" to the jury, he waived the point by not requesting any such instruction. *See* Super. Ct.Crim. R. 30 and 52(b). Absent a request, the court could reasonably determine that the jury would grasp the intended, commonsense meaning of the word without explanation.

Appellant's final contention is that the court abused its discretion in denying his motion to reduce sentence once he gave indication that he could be admitted into a drug rehabilitation program. In declining to change the sentence, the court chronicled appellant's repeated failures to comply with probation and obtain drug counseling and treatment in the past. The court did not abuse its discretion.

*See generally Walden v. United States,* 366    A.2d 1075, 1077 (D.C.1976).